I'd like to reserve five minutes for rebuttal. The jury in this case convicted Mr. Braslau of an offense, count 20, involving the use of wires in March of 2012, that the government now concedes there was no evidence of. It's hardly surprising that the jury convicted on a count where there was no evidence because the jury was not in fact instructed that it had to find that use of wires in order to convict. In fact, the jury was not constructed that it had to find any of the specific uses of the wires or the mails in order to convict on any of the five counts. Ginsburg. Let me ask this question. With respect to your second constructive amendment claim, you argue the jury was allowed to convict based on executions not charged in the indictment. If there was strong evidence to convict Mr. Braslau for each mail and wire fraud count that went before the jury, something you do not contest except as to count 20, then why doesn't your argument fail under the fourth prong of plain error review? Your Honor, I think it does not fail under the fourth prong of plain error review for the reasons set forth in Lapeer and Dipentino. Where we have a case where there's a reasonable probability, and in fact there's a reasonable certainty in this case, that the jury convicted on counts not charged, that affects the fairness of judicial proceedings. In fact, I couldn't guess what the jury would have done had it been instructed it had to find these executions. Now, Cotton is the only case the government cites, and Cotton is totally an opposite. When you look at whether an error seriously affects the fairness, integrity, and public reputation of judicial proceedings, you really need to look at what purposes the right serves. So in this case, a constructive amendment, it's about what the grand jury charged. And so the purposes that the grand jury indictment served are threefold. One, you have the right to presentment, you know, the grand jury's scrutiny. Two, you have a right to notice. And three, you have a right to protection against double jeopardy. In Cotton, all three of those rights were protected. In Cotton, the grand jury, the first indictment, did in fact charge the defendant with the missing element. In that case, the missing element being over 50 grams of crack cocaine. In Cotton, the defendant absolutely had notice as to what it was he was defending against, because that's a case in which the drug quantity was always at issue. This is, you know, it was a pre-apprendi case in which the drug quantity always would have triggered a higher sentence. And third, there was absolutely no problem with double jeopardy in Cotton, because it was the same count. It was the same count that the grand jury indicted on, that the petty jury found on, and that the judge sentenced on. When we have a case like this, where you have a right to be charged, to be tried only on what the grand jury indicted, and we have absolutely no idea whether the jury would have made those findings. Well, wait a minute. If you go through each of the mail fraud counts that actually went to the jury, there's no doubt that there was evidence on each one of those executions for the particular counts, correct? Right, and similarly in DiPantino and Laid Clear. Well, I mean, but it was pretty clear here. Yes. Except for count 20. And the verdict form, well, you know, it identified the individuals. It may not have, it didn't go on to say the specific date of the execution of, the alleged execution of the scheme, correct? And the defense at trial was that this was not a fraudulent scheme. That's correct. And defense counsel never posited any difficulties with, you know, with the way in which the special verdict was framed, or the verdict was framed. Right. And when the government got up there to argue the case at the end, I mean, it used these, you know, these little charts. There's some mistakes in them, but they did allude to the specific executions in their little summary charts that they displayed in front of the jury. Yes. They displayed those summary charts in front of the jury for, you know, a microsecond, because if you look at what the next chart is after that, it goes to the false statement count. And, yes, there are errors. So if we believe that the jury was paying any attention whatsoever to those charts, then they would not have been. But I want to go back to what Judge Nelson's original question was, which was, we're in plain-air review, correct, on this argument? There was no objection by Mr. Braun at the time?  Or no request for a specific jury instruction along this line? Right. So we're plain-air? And so you have to get, you know, even assuming there was error, we have to get to substantial rights and unfairness, prongs three and four. And, you know, there is evidence on each one of these executions. Yes, but I don't know of any case in which this court or the Supreme Court has said, OK, there was evidence of something. So we'll just assume that the jury, if they had been instructed, would have found those things. And let me distinguish this kind of case, the case where we have no idea what the petty jury found, from a case like Cotton or the instructional error cases on which it relies. OK? So in Cotton, we know exactly what the petty jury found, because it found exactly what the grand jury found, right? And we know exactly what the judge found, because the So in those kinds of cases, where all of the elements are in issue at all the time, appellate courts do extrapolate from, this is what the jury found, therefore they must also have found that. So, you know, Cotton is one of the examples. The instructional error cases is another example. When you find a false statement, we know the jury must have found it was material. This is entirely different, because we have no idea what the jury found. Well, let me ask you this. So let's just take it as an example. I mean, and this is just a random example. I have no, you know, reason for picking this one. But let's see. Count 12, was victim Kanani? Yes. The execution had to deal with a $20,000 check, right? I have a chart somewhere that I'm going to look at with you. I mean, I have that chart. I'm just using the one that the government used at the time they argued the case. And your concern is that he may have been convicted on the basis of some other piece of evidence. Yes. What would that other, what would it have been? Well, there's Government's Exhibit 22 and... Hold on, hold on, hold on. Government's Exhibit... Wait one second. Government's Exhibit 22? Yes. Was the film shoot subscription agreement? Yes. Totally different things. Right, so Government's Exhibit 2 was a counter-signed subscription agreement. Totally different items. So that subscription agreement would qualify as a mail fraud? Yes, because it was mailed. Or it could have convicted on Government's Exhibit 24, which was the PPM that was set. So let me ask you this. Again, not charged in any way. So these exhibits come in as the PPM. And so failure to, at least in the verdict, and minimally in the verdict, include the specific item charged? Or I guess the problem could have been solved if the judge had just sent in the indictment. Well, maybe it would have been. In Ward, which is a case that I think is really on all fours except for in that case that error was preserved, the judge did send back the indictment. So in Ward there were specific executions that were charged. The government proved those identities, plus quite a few more. And the jury wasn't instructed which identities it needed to find. There was no defense that, oh, he's guilty on these two but not the other ones. There wasn't anything like that that went on. But this court held that it was non-harmless error to allow the jury to convict on identities that were not charged. In fact, there's a really simple way to think about this. There was a lot of emphasis in this trial on the PPM and the sales material. In fact, that seems like what most of the briefs are about. The government did not charge the mailing of the PPM or the sales literature in any of the counts. So if the jury had kind of been focused on the materials that the government says are most important, they would have convicted on counts that were not charged. Well, they had to establish what the scheme was. Yes. And then they had to show that it was implemented in some way, that it was carried out. And so they picked these victim-related counts. Right. So the PPM and the sales materials were sent to every single victim. So if the jury had said, well, we know that the PPM and the sales materials were sent to every victim, so let's convict because that's the use of the mails. In fact, that is what the government argued in its closing. They said, we know that FedExes were sent to every state. But they still had verdict forms that identified each victim for each count. Yes. And so for each count, every single victim received sales literature. If the jury had convicted on those mailings, that is not what the grand jury indicted on. Okay. Similarly, with the phone calls, there was a lot of talk about surveyors calling. If the jury had convicted on all those phone calls, the phone calls of the surveyors, that also would have been a constructive amendment because that is not what the grand jury charged. It's no accident in this case that the government didn't charge executions that began before 2012, right? But we don't know which one the jury chose. You know, it sounds like very technical, but I challenge the court or the government to find a single case in which this court has affirmed where we literally don't know what the jury found. Your time is running out, and I wanted you to address. So account 20 is a little bit different, correct? Account 20, there was just no evidence at all. It was on or out a certain date, and there's no evidence? There's no evidence. Well, they say, well, the March, the August date, what was it? They say that the August 2012 date. It was on or about? The government has conceded that on Friday. They did? Yes. Was there a 28-J letter filed on Friday? On Friday, and that's why I say the government conceded. Oh, I didn't see it. I'm sorry.  It tells us that the jury was convicting on executions not charged. It confirms that this is not just a reasonable probability. There is a reasonable certainty in this case. Well, account 20 had its own difficulties just standing alone, because for me, five months later is very difficult to say that that's reasonably near the event charged in the indictment. I agree with you. We have a case law that talks about seven months as not being reasonably near, and our case law seems to say- You could argue those cases are different, but if the government's conceded it- But anyway. Okay, so then you also have count 26, which is the false statement count. Yes. Correct? Yes. I can address that, but I wanted to preserve a little bit of time to talk about sentencing. All right. Well, that's fine. Is that- That's fine. The reason why I just wanted to get a little bit of time on sentencing is because just with respect to the constructive amendment on count one, what we know is that the jury was not required in this case to find that the fraud was a fraud from the beginning. In fact, the evidence was quite strong that the fraud was not a fraud from the beginning. We had a very financially successful executive producer and director, et cetera. The jury was not required to find that, and so either it's a reversal on that, or we accept that the conviction is okay, but that the sentence is not because Mr. Braslaw's attorney disputed the loss amount and the victim's amount in this case absolutely, and the court did not resolve the dispute. All the court said was the jury had made its findings, and based on those findings, the loss amount and the victim amount is correct. If we just started from February of 2012, which is when the executions of the government charges started, the loss would have been under a million dollars, and there would have been less than 50 victims, so the sentence would already be reduced by 30 months just based on that kind of math alone. What I'm saying is that it's no accident that the government started charging executions in February of 2012, because their key witness said it was sort of towards the end of 2011 that I started feeling uncomfortable about what's going on. So if we took only the losses, and we took every single loss that was incurred after February of 2012, the losses in this case would have fallen below one million dollars, and the victims would have fallen below 50. So even if the court doesn't think that that kind of constructive amendment requires reversal of convictions, it absolutely requires reversal of the sentence. You're just about up with your time. Good morning, Your Honors. May it please the Court. Stephen Cazares for Plaintiff Appellee, United States of America. I'll first address the constructive amendment claim regarding the executions, the mailings and wirings that defended challenges. Now, as the defendant has conceded, the evidence proved each of the executions, but for count 20, the government has conceded the sufficiency issue with respect to count 20. The issue with count 20 was, to be frank, a typographical error. It said March of 2012. It should have said March of 2013. We didn't notice it in trial. It happened, and we concede that. That's distinct from what we're talking about with respect to each of the other charged mailings and wirings. The evidence established each of those counts. In addition, the verdict form, as the Court noted, referenced each of the charged victims, each of the victims related to the specific mailings and wirings. So let me just follow up on my question that I asked. So count 12 with victim Kanani, there were other mailings to him as well besides the $20,000 check. Is that right? Absolutely. So how do we know they didn't rely on the other mailings besides the check? We know that evidence was submitted, but we also know the distinction between the charge here and what defendant relies most upon is the ward case. What you have charged here is a three-year scheme to defraud, specifically alleged in long pleadings in the indictment, including approximately 70 victims, $1.7 million in loss, and the government charged approximately, I think, about two dozen executions in total. Now at trial, we narrowed. We didn't even call all those victims. We tried to shorten the trial. So we didn't submit all of those executions to the jury to consider. So that is very distinct from what you had in ward. In ward, you had two distinct 1028A counts relating to two specific victims. At trial, the government introduced these other victims whose identities were stolen to try to establish the defendant's knowledge. But there is no argument and no claim can be made that the offenses against those other victims related to the exact charges, the 1028A counts. Those aren't scheme counts. Those aren't conspiracy counts. Those are discrete theft of the identities of those two victims. Here, the defendant was put on notice of a three-year scheme to defraud, including, throughout the scheme, FedExes, interstate wire transmittals, a telemarketing boiler operation was specifically alleged in the indictment. So the defendant can claim no notice that he was unaware that he had to defend against all of the evidence relating to his defrauding of Mr. Kinane, who invested, I think it was four to five times over the year that he was being called. The idea that defendant, and defendant also doesn't raise some sort of timing alibi or defense. He wasn't around when some of these other transmissions may have happened. So it is theoretically possible that the jury could have had in their mind some of mailings and wirings that weren't the subject of the specific executions. The government doesn't submit that there was a plain error there. But let's say it was. The lack of specificity in the verdict form was enough to raise the error. Was defendant prejudiced by that? Government submits that there's no way defendant can establish prejudice in this case. Because he concedes all the evidence to prove each of those executions, the government in its argument asks the jury to convict based on those specific executions. Defendant references how fleeting it was. This is a criminal trial. Everything we say is somewhat fleeting. Unless it gets repeated by someone else. I noticed that the district judge put you guys on a pretty short lease. We rely upon people's memories. And they're taking in all of the evidence and arguments. So the government made that argument. The evidence relating to each of those executions was introduced. And that's unlike what happened in Ward. They're just distinct. There's no doubt that Ward, the trial, introduced victims whose names weren't in the indictment. Here, each of the victims, the subject of the charged executions, was referenced in the indictment. Defendant was put on notice. So the defendant cannot establish prejudice. And even if this court were to go so far as to say, yes, he's established prejudice, should you exercise the discretion here? And the government submits no. Defendant attempts to argue that Cotton is distinct. The government submits that if you look to the Johnson case, upon which Cotton relies, in that case, the materiality element of the charge was not submitted to the jury. And the court said, notwithstanding that, the fact is, the evidence was overwhelming, and the evidence was admitted at trial that proved the count. Well, let me ask, did the jury instructions adequately cover the defendant's theory concerning materiality as to the false statement charge? Well, the defendant asked the district court to add language relating to the safe harbor from broker-dealer registration into the 1001 instruction. The government submits that, first of all, that safe harbor, whether or not Rowett could qualify to not have to register with the commission as a broker-dealer, is irrelevant to the 1001 for several reasons. The most important of which is the fact that the false statement that defendant made about the payment of commission as opposed to this hourly salary contingent on a sale, is that the false statement took place in the context of an investigation. While the commission are gathering facts, while they're making determinations, who to subpoena, what documents to obtain, what questions to ask. And the issue is, does that false statement, in some way, is it capable of influencing their decision-making in that investigative process? And the answer is, of course. Defendant's argument is that, well, because ultimately a commission and this salary contingent on a sale, you know, maybe they both would have made Rowett ineligible for the broker-dealer safe harbor. Maybe so, but that's an ultimate decision that maybe theoretically could be made at the end of an investigation. This is in the core of an investigation, and Mr. Blau told the trial court there were three areas that the commission questioned and answer related to that was important to them. That was the regulation of broker-dealers, the regulation of private securities offerings, as well as the investigation into representations to investors. That's at the core of this case and this investigation, that last possibility. Defendant raised no issue, didn't ask for a special verdict on the 1001, to require the trial jury to break down which theory, I guess, of materiality it relied upon. None of that was asked. Did defense counsel submit a specific instruction that he wanted the judge to give? He did not. He had raised the arguments regarding the broker-dealer safe harbor in trying to get the account dismissed. The court rejected it. He raised the issue again and asked that that language be included, but he didn't actually submit an instruction in writing that had the actual language, so no, that did not take place. But the judge did instruct on materiality. Absolutely. The judge's instruction was proper. Defendant simply argues that his theory, I guess, of the case wasn't included, but the government submits that that theory was irrelevant, whether or not Rowett qualified for a safe harbor exemption is irrelevant to the materiality of the false statement in the investigatory stage. That is really important. Is it because it was in the investigatory stage that it was irrelevant? Not only, but that's a key moment because defendant's argument is, again, it gets to kind of an ultimate decision. There was no difference in defendant's view between the payment of a commission and the payment of a salary contingent on sale. I'm not sure that's right. The payment of a commission is a factor that the SEC takes into account in determining whether you may qualify for the safe harbor, but the fact of the matter is by making a false statement about the form of the payment, you are inducing the SEC to possibly ask questions, follow paths, make decisions in the investigation that it may not otherwise have done but for that lie. That's why it's material. It has to be material. There's no way it can't be material in this context. With respect to defendant's argument, I call the commencing argument constructive amendment relating to the beginning of the scheme to defraud, which also relates to the loss challenges, I guess, as well. The government's theory of the case in this case, from the beginning, as charged in the indictment, we specify in or about December 2010 through the next three years. In opening, the government argued that the scheme began in or about December 2010 and specified. We represented that you're going to know that because you're going to see the contracts that defendant enters into on January 5th and for the rest of January of 2011, committing more than half of investor money to himself and his co-schemers. That's in the opening at pages 114 and 116 of the transcript. In the trial, those same contracts were introduced, showing that defendant began to commit money he hadn't even obtained yet to himself and his co-schemers. Soon thereafter, he prepares the prospectus, which claims two-thirds of the money is going to go to the project, which was not what he had already done. He'd already executed the contracts, committing the money to himself as the money was raised. The contract said something like, in peri pursu, is the way he referred to it in the contract. That's how the government argued in trial that the trial court knew that the scheme began in or about December of 2010. Defendant essentially has latched on to the government's response to his good-faith claim. In defendant's view, because he and Holdom and Chortkoff in December of 2010 really wanted to make a movie, they really wanted to be successful, and they hired a real director and producer, then they didn't have the intent to defraud at that time. That's his theory of the case. And in some way, maybe later on, he developed some sort of intent to defraud based on the results, but that's not what the government charged. The government's response to that was simply, those things may be true, but if you lie to the investors to get their money, it's still a fraud. I mean, there's no doubt about that. In the Beercroft case, in the Bush case, you could have good faith, but if you lie to get the money to live your dreams, you're still guilty of the offense. So that was the government's response to his defense, but that was not the prosecution theory. The ball here did not move mid-trial to some way induce defendant into not making certain claims or defenses. So there was no prejudice, certainly, with respect to the commencing argument. Then it raises the issue with respect to the vulnerable victim enhancement, suggesting that the experience and sophistication of the investors here was somehow unique, different from the Lloyd case. I was one of the trial lawyers in the Lloyd case. That's clearly not what happened. But you can look specifically to this case. Well, under our case law, it would be hard to say that the district court judge abused his discretion in applying this particular enhancement. The government agrees, and the fact of the matter is... But, you know, I noticed, I thought it was interesting, though, that the district judge didn't apply it in Rawood's case. And that was not for trying by the government. The government did ask the court to apply it, because we believe it did qualify under the facts. For whatever reason, the district court did not apply it. Ultimately, the government made an 84-month recommendation in that case, and the court sentenced Rawood to, I think it was 63 months. So to the extent there's some argument that there's some sort of sentencing disparity here, resulting from the failure to apply the enhancement there, it really didn't happen, because they're not similarly situated. Rawood was a salesman. Defendant was controlling the whole operation. Defendant controlled the purse, where the money went, and who got the money. They were not similarly situated. There was no disparity, even though the court should have applied it there, but didn't apply it. With respect to... Well, let me just ask about the enhancement. You argue that a 16-level enhancement for a loss greater than a million and the four-level enhancement for more than 50 victims are based in context within the scope of the scheme where Mr. Breslau was found guilty by a jury. Now, what's your support for that argument? That is the testimony of Special Agent Storr, which is on the eighth day of the trial, in the transfer. Special Agent Storr testified and presented summary charts to the jury accounting for approximately $1.7 billion. The loss number at sentencing was reduced because some of the victims we couldn't specifically identify. We knew they invested, but we couldn't name them, so the ultimate loss figure was slightly lower. Special Agent Storr accounted for his analysis in the financial records of approximately 70 victims. So the court and the trial court heard that testimony and credited it at sentencing. It's that simple. So if you conceded on Friday that count 20... Is it count 20? Count 20, yes, Your Honor. There should be a reversal on count 20. We have to send it back for resentencing, correct? Well, would that have any impact if the court... Well, I don't know what the district court's going to do. I mean, if the court sustains the other fraud counts, the dismissal of the count 20 would have no impact. As a practical matter, I don't believe the court really would need to, but as a technical legal matter, I can't say I am well-versed in whether or not this court would have to... I don't know. ...resentencing on one count when the sentencing was concurrent and not consecutive. Maybe you're right. It would seem to be a waste of time. Unless the court has any other questions for me, I think I'm finished. I don't. Thank you. You had a minute for rebuttal. First, I think that the court should send it back for resentencing. In a case like this where the judge says that I'm basing the sentencing based on the jury's verdict and the government has conceded that one of those verdicts was not supported by sufficient evidence... But do that many count? Well, in a case like this, again, where the judge made no findings, he said he was sentencing solely based on the jury verdict. And I just want to... In this particular case, it's true. The government did present evidence that there was $1.7 million in loss. But the jury was not required to find that. And the judge made no findings with respect to the loss. On count 26, because I rudely ignored Judge Pius' request that I address that... Your choice. You know, the government argued extensively in its closing argument that if you pay a commission, you better have a license. Brazois knew that. They said it 1, 2, 3, 4, 5 times. They told us that their theory of materiality is that if you pay a commission, you better have a license. So the court's failure to instruct that, you know, if you pay a salary based on sales, you also need to have a license, was absolutely relevant to the materiality of that statement. I'm not saying that there weren't other bases on which the jury could have convicted. What I'm saying is that if the jury convicted on the ground that the government argued, then that would require reversal. But you didn't even submit a proposed instruction. Defense counsel... Oh, well, that's... Defense counsel did not submit a proposed instruction, but he did ask the court to instruct as to the definition of commission in that context. So he didn't, like, have it in writing. But defense counsel also said at a certain point, oh, I'm really busy, but this is what I want. And so I wasn't defense counsel in this case. Look, you know, defense counsel was Harlan Braun. Yes. He's one of the, you know, he's a well-respected defense lawyer. Absolutely. And he absolutely requested this instruction. He just didn't submit one in writing. Oh. Well, and so he just thought that the judge should craft an instruction? I guess so. What he was really asking for was a Rule 29. I know I'm out of time, but if I could just respond briefly to the arguments of prejudice and why it's unfair. The government... One minute. One minute. The government has really confused the question of prejudice in this context. This Court is very clear that for the third prong review, it's sort of like the flip side, the mirror image of harmless error review. And this Court is very clear that when it's a constructive amendment, the prejudice question is, is it reasonably probable that the jury convicted on offenses not charged? And in this case, especially given the government's assertion as to Count 20, that the jury did, in fact, convict on an execution not charged, the third prong is met. I think the much more difficult prong is the fourth one. And again, I think we need to look at, what are the purposes of the grand jury indictment, and were they served here? If I could focus just on the double jeopardy one. How is Mr. Braslaw to plead protection from double jeopardy when we do not know which executions the jury has already convicted him on? OK. Thank you. Thank you. That ends our session for today.
judges: D.W. Nelson, Paez, Bucklo